## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 22-CV- 01853

**ORECONTROL BLASTING CONSULTANTS, LLC**, and
**OREPRO HOLDINGS, LLC**

      Plaintiff,

      v.

**HEXAGON MINING INC.,** an Arizona corporation,
**JACQUE JANSE,** an individual,
**JEFFREY LOEB,** an individual, and
**NICHOLAS HARE,** an individual,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

COMES NOW, Plaintiffs OreControl Blasting Consultants, LLC and OrePro Holdings, LLC (together "OBC" or Plaintiff for convenience), by and through its legal counsel Scott D. McLeod and Joseph A. O'Keefe of McLeod | Brunger PLLC, hereby submits its Complaint and Jury Demand against the Defendants, Hexagon Mining Inc., an Arizona corporation ("Hexagon"), and Jeffrey Loeb ("Loeb"), Jacque Janse ("Janse"), and Nicholas Hare ("Hare") (or together "Defendants"), and in relation to the "BMT Litigation" which Defendants directed from their Arizona office in the District of Colorado, Case No. 20-cv-02444-RBJ-MEH, alleges the following:

### I.    <u>INTRODUCTION</u>

*"If they compete, we'll sue them. If they win, we'll buy them."*

— Jacques Janse, Former Hexagon Executive and CEO of Blast Movement Technologies.

1.      Fair competition is the engine of innovation, but far too often that engine stalls when innovation upsets a status quo ripe for disruption.

2.      Market allocation and conspiracies to monopolize are economic crimes with potentially devastating effects on the U.S. economy. They rob customers, hurt employees, contribute to inflation, destroy public confidence in the economy, harm innovation and those that innovate, and undermine our system of free market competition.

3.      The Sherman Act of 1890 is a founding part of the comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade in the United States.

4.      Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits any agreement among competitors that unreasonably limits competition.

5.      Market allocation schemes are agreements among competitors to divide the market among themselves. For example, in customer allocation, competing firms may divide up, or attempt to divide up, specific customers or types of customers so that only one competitor will be allowed under the conspiratorial agreement to sell to or bid on contracts by those customers.  The conspirators insulate themselves from competition and are collectively able to raise prices.

6.      Market allocation agreements are a violation of Section 1.  These agreements to restrain trade raise prices or restrict output, and in some cases, defraud customers, without creating any plausible offsetting benefit to consumers.  They are *per se* illegal which the U.S. Supreme Court has described as "the supreme evil of antitrust."[1]

7.      A "no-poach" agreement is an agreement between two or more employers – or even

---

[1] *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

2

their third-party agents or intermediaries, *e.g.,* recruiters – not to solicit (including cold calling and recruiting), hire, or otherwise compete for each other's employees.  No-poach agreements are market allocation agreements.  However, instead of allocating a company's output (*i.e.,* its customers or territory), labor allocation agreements allocate a company's input (*i.e.,* its employees). No-poach agreements eliminate employers' competition for workers.

8.     Customer and territorial allocation agreements hurt customers. No-poach agreements hurt workers.  Both are *per se* violations of Section 1.

9.     Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempts to monopolize, and conspiracies to monopolize.    A conspiracy may represent, among other things, (i) a conspiracy to monopolize through *per se* Section 1 anticompetitive conduct (*i.e.,* market allocation); or (ii) a conspiracy to monopolize through other unlawful conduct.

10.     Defendants have acted in conspiracy to violate both Sections 1 and 2 of the Sherman Act.

11.     T. William "Will" Hunt, a graduate of the Colorado School of Mines, founded OreControl Blasting Consultants, LLC and then co-invented OrePro® 3D, software that revolutionized how mine operators evaluate the sites they are mining.

12.     Hunt was a former employee of Blast Movement Technologies USA, Inc., apparently a subsidiary of Blast Movement Technologies (BMT), an Australian conglomerate, until August of 2017.  Hunt was a sales employee who never developed any products for any BMT entity and was not involved in research or development (R&D) projects.  Hunt did not have access to proprietary information about BMT's product.

13.     It is this former employment relationship which Defendants conspired to misrepresent and exploit in 2020 in order to restrain global trade, abuse the U.S. legal system, and

inhibit innovation for their own economic benefit.

14.     Hunt, along with co-inventors U.S. Citizen Jeffrey Seaman, and Australian David LaRosa, invented OrePro® 3D and brought it to the market more than 1-year after Hunt's employment with BMT ended in August 2017, seeking patent protection for the invention with the USPTO on March 26, 2019.

15.     OBC was initially organized to provide consulting services to the mining industry in May, 2017.  Defendants Janse and Loeb knew this because it was public information and because it was disclosed to them when he gave his notice of resignation in May, 2017.  Hunt also agreed to work for BMT for another 90-days, approximately, during a transition period and even trained his replacement, Colorado resident Brennan Laird, and other employees such as Marcell Silveia.

16.      However, Hunt and OBC later developed throughout 2018 a product offering eventually known as OrePro® 3D, which was offered to the market for sale in 2019.   OrePro® 3D is a software based modelling application in the international grade control market within the surface mining industry.

17.     Defendants do not offer a competitive modeling solution and have mischaracterized OBC's modeling solution as a mere "guess" and a "magical algorithm."  However, Defendants' skepticism caused them to make disastrous economic decisions, including the decision to not to meaningfully consider and develop any technology regarding blast movement modeling, before or after Hunt's employment with a BMT entity ended in 2017.

18.     This software utilizes data that the mine operator collects before the blast, such as blast design and geology, and after a blast in an open pit mine to create a fluid movement model of the blasted rock. This helps the mine operator with grade control without the need for expensive

and specialized single use devices, while presenting a three-dimensional model that is enhanced with model driven specific guidance to improve recoverability of ore and minimization of waste.

19. Defendants' relevant competitive product offering is the "BMM" (blast movement monitor), a single use device that is installed in specially-drilled holes pre-blast. When the blast is fired, BMMs emit a signal post-blast which mine operators attempt to locate via peak signal with a handheld device, or more recently, a drone. Once located, the change in location of the BMM is plotted using any number of software applications, and a vector is created. Thus, BMMs are blast vector indicators ("BVI"s) that are fundamentally different then OrePro® 3D, which is modeling software.

20. BMMs are similar to any number of other non-technical BVIs in the market, including PVC or bamboo pipes, paint cans, chains, and magnets.

21. When OrePro® 3D was initially launched into the marketplace in early 2019, it was not competitive at all, in-fact it was complementary, which Defendants knew and enjoyed the benefit of because it increased their sales. BMT encouraged its customers to use BMM generated data, which is actually owned by the customers, with other third-party software applications such as Vulcan, Surpac, and Datamine.

22. It was not until Plaintiff invented SmartVectors™ - which Plaintiff applied to be registered on March 4, 2020 as a trademark, and which was ultimately registered as a trademark on February 23, 2021 by the U.S. Patent and Trademark Office - that Plaintiff offered a competitive product to the BMM.

23. Therefore, it was not until 2020 – nearly 3-years after Hunt resigned from BMT in May 2017– that OBC's software OrePro® 3D began directly competing with Defendants' hardware (BMM) product line.

24.     This is important because in January, 2020, Defendant Hexagon acquired the maker of the BMM, Blast Movement Technologies ("BMT"), for a significant sum.

25.     This is also important because Defendants knew that the founder of OBC, Will Hunt, used to be a sales employee of BMT through August, 2017.

26.     In February 2020, Defendants came to realize that OrePro® 3D was now a competitor because post-blast grade control could be effectively, reliably, safely, and economically accomplished exclusively with a software application and without the need for its flagship BMM product at all.

27.     Prior to this, Defendants effectively enjoyed a monopoly in the post blast grade control market and for BVIs.  However, like all monopolists, Defendants did not have economic incentive to innovate, and they didn't.

28.     In February 2020, Plaintiff began to disrupt Defendant's global monopoly, which included the United States and the state of Colorado, which Defendants import BMMs into.

29.     Plaintiff introduced SmartVectors to the market at a trade convention in Denver on February 23-26, 2020.  Defendants then scrambled to come up with a strategy to deal with its now antiquated BMM product that no longer appeared market competitive.

30.     After the roll out of SmartVectors™ in February 2020, OrePro® 3D became a proverbial BMM-killer in the market because it was better at grade control, offered new and innovative features, is more reliable, easier to use, less expensive, reusable, and safer than BMMs.

31.     Since Defendants lacked the innovation, skill set, and employees to bring its own competitive software offering into the market, nearly three years after Will Hunt's employment with BMT ended, Defendants decided to abuse the legal process as a strategy to protect its monopoly.  Defendants made and published misrepresentations about Hunt, OBC, OrePro® 3D,

and their own antiquated hardware technology, the BMM.

32.     Rather than compete, Defendants choose to initiate the BMT Litigation in August, 2020 as the puppet master of a shell company – BMT – to achieve the anticompetitive end of using litigation to destroy Plaintiff as a start-up competitor, to intentionally and without basis defame Plaintiff and its principles worldwide, to create a disincentive to potential purchasers which decreased the pool of potential acquirers of OBC's product and assets, to decrease the sale price of OBC's product and assets thereby harming competition in the market, all in a bad faith and anticompetitive effort to slow Plaintiff's market adoption with the initial goal of buying Plaintiff's technology after diminishing or destroying its value.

33.     Once OrePro® 3D and most of Plaintiff's assets were acquired by a subsidiary of a publicly traded minding company who is also a party in the BMT Litigation with the means to defend itself.  The buyer of Plaintiff's assets was the sole remaining potential buyer of Plaintiff's software due to the bad faith cloud Defendants had cast over Plaintiff and its principals worldwide.

34.     When the buyer refused to re-sell OrePro® 3D to Defendant Hexagon, Defendants' strategy pivoted to include anticompetitive behavior and market allocation in the post-blast grade control market for customers and employees alike.

35.     BMT was initially quite pleased with the launch of OrePro® 3D into the market because it drove BMM sales.

36.     BMT was and always has been a hardware company selling its single use, disposable and expensive locator beacon to mines.   BMT is not a software company and, prior to being acquired by Hexagon, it did not generate revenue from the sale of software, models, or grade control consulting.

37.     Its free software application known as BMM Explorer is clunky and does not work

well.  Defendants advertise on their website that customers can export their BMM data into other third-party software packages, such as Vulcan.  BMM Explorer also does not generate any independent revenue from the BMM for either BMT or Hexagon.

38.     OrePro® 3D also functions completely differently from BMM Explorer, which Defendants know full well.

39.     Defendants also always knew relevant that Plaintiff was organized initially to perform consulting services, and then eventually developed OrePro® 3D.  Despite this knowledge, Defendants falsely and maliciously alleged Hunt had developed OrePro® 3D while he was employed at BMT.  Plaintiff was never a hardware company and does not sell hardware-based products.  In-fact, OrePro® 3D is hardware agnostic.

40.     Despite Defendants' contentions to the contrary in the BMT Litigation, Plaintiff's software product did not begin any meaningful level of development until Plaintiff hired a computer programmer, also an owner of OBC, Jeff Seaman, in February 2018.  Mr. Seaman wrote every single line of code within OrePro® 3D from scratch.  Defendants knew this and continued to prosecute the BMT Litigation to achieve the unlawful goals described herein, such as the unlawful market allocation of customers and employees alike.

41.     Since being acquired by Hexagon in January 2020, BMT was – by the end of the year – folded into the Hexagon family of product offerings, its assets distributed amongst subsidiary companies such as Leica Geosystems Pty Ltd and Hexagon Mining, which Hexagon represents to the United States Patent and Trademark Office to be a "Limited Liability Company Australia," whose principal place of business is reported to be 240 Queen Street, Level 16, Brisbane, Queensland, 4000 in Australia.

42.     Hexagon's BMM product is antiquated, expensive, inherently unsafe, and provides

far less value for mine operators.  However, they also are the dominant solution in the market as a legacy of their time as a monopolist, which Defendants have conspired to preserve.  It is this market dominance that motivated Hexagon to buy BMT in the first place and eventually orchestrate the campaign against OBC and Will Hunt personally when Hexagon discovered that they bought a BMM product at the beginning of its market decline in 2020.

43.     Instead of bringing more value to the market by innovating, Hexagon accelerated the campaign to defame the Plaintiff, defraud its customers, restrain trade, and protect the monopoly they just purchased at all costs.

44.     For example:

i.    3-years after Hunt's employment with BMT ended…

ii.   1.5-years after Defendants knew OrePro® 3D was in the market…

iii.  8-months after purchasing BMT…

iv.   6-months after the launch of SmartVectors™ by Plaintiff into the market…

v.    And only 2-months after Defendants learned that Seequent, a major international mining company, was seriously considering acquiring OBC…

Hexagon initiated and prosecuted the meritless BMT Litigation to increase the pressure on OBC in shell company BMT's name, an entity that does not appear to have any employees or assets at all beyond the brand owned by Hexagon.  Hexagon, through its shell BMT companies has also opposed being joined in the BMT Litigation necessitating this action in order to preserve Plaintiff's rights.

45.     The reason Defendants did this was to drive the value of OBC down so that Hexagon could acquire OBC on the cheap or force it into an unlawful horizontal market agreement to allocate, share, and protect its customers and employees from the perceived competition. That

is what this case is about, Hexagon's dirty tricks campaign against OBC to manipulate or allocate the market for its advantage.

46.     Hexagon also intentionally disrupted the market for potential buyers of OBC's assets and business by creating the appearance that any potential buyer of OBC would be "buying litigation" which had the effect of dramatically decreasing the number of potential buyers of the business, decreasing its ultimate sales price, and also decreasing OBC's access to capital.  This anti-competitive behavior is the enemy of innovation and OBC deserves justice.

47.     Plaintiff specifically alleges the Defendants are liable to it under the follow legal theories:

     i.    Civil Conspiracy (Count 1)
    ii.    False Advertising and Unfair Competition – 15 U.S.C. § 1125 (Count 2)
   iii.    Violation of the Sherman Antitrust Act of 1890 – 15 U.S.C. § 1 (Count 3)
   iv.    Violation of the Sherman Antitrust Act of 1890 – 15 U.S.C. § 2 (Count 4)
    v.    Colorado Organized Crime Control Act – C.R.S. § 18-17-101(Count 5)
   vi.    Tortious Interference with Contract and Prospective Economic Advantage (Count 6)
  vii.    Commercial Disparagement (Count 7)
 viii.    Abuse of Process (Count 8)
   ix.    Misappropriation of Trade Secrets (Count 9)

48.     As further elucidated in this Complaint, this was a worldwide conspiracy to unlawfully restrain competition through fraud and deceit inflicted millions of U.S. Dollars in damages and these counts are properly before this Court.

## II.     PARTIES

49.     Plaintiff, OreControl Blasting Consultants, LLC is a limited liability company organized in 2017 under the laws of the State of Colorado.  OBC's current principal place of business is located at 65 Antelope Springs Road, Tie Siding, WY 82084.  The members of OBC

are residents and citizens of Wyoming, New York, and Australia. Will Hunt is the majority member of OBC and the sole member of sister company OrePro Holdings, LLC and is a resident of Wyoming. Will Hunt is also the Product Owner for OrePro® in Colorado.

50.     Plaintiff, OrePro Holdings, LLC is a limited liability company organized in 2019 under the laws of the State of Colorado. OrePro Holding's current principal place of business is located at 65 Antelope Springs Road, Tie Siding, WY 82084. The sole member of OrePro is Will Hunt a resident and citizen of Wyoming.   Prior to the sale of assets in 2021, OrePro Holdings is, or was, the owner or assignee of the intellectual property at issue in this action, which it licensed to its sister company, OBC, for use in interstate and international commerce.

51.     Defendant, Hexagon Mining Inc., is a corporation organized under the laws of Arizona, with a principal place of business located at 40 E. Congress Street, Suite 300, Tucson, AZ 85701 that operates as a part of a web of interrelated entities in interstate commerce and around the world. Hexagon advertises in interstate commerce that its Arizona location houses its planning, operations and safety solutions for the mining industry. Hexagon's registered agent is Humberto Alonso Astorga, with a principal place of business the same as the Defendant.

52.     Defendant Jacque Janse was the CEO of BMT prior to the acquisition of that company by Hexagon. Janse was employed by Hexagon as an executive until Mr. Janse departed sometime in late 2020 after commencing and directing the BMT Litigation. Janse has appeared in the BMT Litigation and acted on Hexagon's behalf since departing its employment. Mr. Janse is a South African citizen and resident of Australia for diversity jurisdiction who profited personally from the schemes described herein and had an economic interest in the sale of BMT to Hexagon. Currently, Mr. Janse is CEO of Phibion Pty Ltd, an Australian company who advertises that its business is located at 158 Benjamin Place Lytton, 4178 Brisbane, Queensland, Australia.

53.     Defendant Jeff Loeb is the Portfolio Manager for Hexagon Mining Inc. and is a citizen of Canada for purposes of diversity jurisdiction.  Mr. Loeb's work address is reported by Hexagon to be Suite 401-1166 Alberni Street, Vancouver, BC, V6E 3Z3, in Canada.  Loeb profited personally from the schemes described herein through his incentive compensation plan with Hexagon and BMT.

54.     Defendant Nicholas Hare is the President of Hexagon Mining Inc. and is a citizen of Arizona for purposes of diversity jurisdiction.  Mr. Hare directed the BMT Litigation, which Hexagon initially prosecuted in close collaboration with Mr. Janse, from Hexagon's Arizona office, and from within the District of Colorado in the related case of 20-cv-02444-RBJ-MEH. Hare profited personally from the schemes described herein through his incentive compensation plan with Hexagon.

### III.    <u>JURISDICTION & VENUE</u>

55.      This case arises under the laws of the United States and the State of Colorado. Accordingly, the District Court has jurisdiction over claims arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331.

56.     This Court has Jurisdiction over Plaintiff's request for declaratory judgment and declaratory relief pursuant to 28 U.S.C. § 2201 as implemented by Rule 57 of the Federal Rules of Civil Procedure.

57.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and because there is complete diversity of citizenship between the Plaintiff and Defendants, and because this action involves one or more citizens of a foreign state.

58.     This Court also has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367 and under Colorado law pursuant to C.R.S. § 13-1-124 because the parties transacted business within the State of Colorado and committed, in-part, the tortious acts described herein within Colorado.

59.     The Court has jurisdiction to enjoin actions which violate the Lanham Act and award damages in accordance with that statute.

60.     The Court has jurisdiction to enjoin actions which violate the Sherman Antitrust Act of 1890 and award damages for any antitrust injury suffered.

61.     The Court has jurisdiction to enjoin actions which violate the Colorado Organized Crime Control Act and award threefold actual damages suffered.

62.     The Court has jurisdiction to enjoin actions which violate the Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act and award exemplary and actual damages suffered.

63.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a) because a substantial part of the events or omissions giving rise to the claims, and the effects thereof, occurred in Colorado while OBC conducted business operations from its principal place of business in Colorado.

## IV.   **GENERAL ALLEGATIONS**

64.     The mining industry knows that grade control is a complex problem that directly affected profitability.

65.     Knowing the difference between valuable ore and valueless waste is crucial and BMT's and Hexagon's hardware based BMM represented some progress in finding a solution to the problem of grade control when it was developed.

66.     But their solution is now more than 18-years old with little serious innovation to its technology or process.

67.     BMT was the very type of firm subject to technological disruption from a nimble competitor because it was content to rest on its innovation laurels and reap the free cash flow.

68.     In 2020 Plaintiff became a competitor that revolutionized grade control through software when it developed OrePro® 3D and SmartVectors™, which represents a novel and next generation approach to creating a post-blast model which optimizes a mine operators' revenue, minimizes their costs, all of which results in a more profitable approach to understanding post blast geology and thus more efficient mine operations.

69.     Plaintiff's solution was an existential threat to its market competitor BMT, which was acquired by Hexagon. They were not equipped to respond to OBC's innovative and novel OrePro® 3D approach with a sufficient competing product.

### Why OBC's Solution is Superior to BMMs

70.     The mining industry traditionally relied upon hand-drawn ore "blocks" (or 2D polygons) based on a subjective, 2D, approach for delineation of material types in a volume of rock to be blasted.

71.     BMT's software does not even create ore "blocks." It relies on mine operators to provide their own "blocks", which are a series of nodes connected by line segments. BMT's software then simply translates the nodes horizontally, using only the BVI vectors, regardless of whether the BVIs generated by their BMMs is accurate, or not.

72.     While BMT claims that it utilizes a 3D approach, its software only displays vectors given by their BMM vectors in 3D. All calculations are actually performed in 2D.

73.    This is important because OrePro® 3D's software has the capability to optimize these blocks and perform 3D calculations that give more precision for mine operators. BMT's free tag-along software can do neither.

74.    For example, BMT's and Hexagon's products do not provide guidance or calculation of any kind on mining direction, dig face angle, and minimum mining shape sizes. OBC's does.

75.    BMT's and Hexagon's products do not consider important data such as the post-blast ore location and the shape of the structures after the blast has warped them when operating. OBC's does.

76.    BMT's free 2D solution is imprecise and can cost mine operators hundreds of millions of dollars in lost revenue by way of *ore loss* and increased costs associated with mining unprofitable post-blast material known as *dilution*.

77.    In-fact, BMT/Hexagon's free software contains no ore "block" optimization – i.e., a sophisticated algorithms that assist geologists in delineating material types to achieve highest overall value – at all. In contrast, OBC's software does.

78.    Additionally, the single use hardware used by BMT's solution is inferior because the frequent errors where unlikely or impossible movement is recorded, but the source of the errors remains unknown because the devices are not recovered for study. Any number of problems render some data collected useless and operators have no ability to diagnose and solve the problem. There is no mechanism or algorithm in the BMM, the BMM Detector, or BMT/Hexagon's software to tell a user if the BMM originated vector is accurate.



79.    The importance of these shortfalls cannot be overstated. Bad data means bad results.  Even worse than bad data is a dataset where good and bad data cannot be distinguished reliably.

80.    Below is a picture of a typical "muck pile", or blasted rock that has not been mined yet.  Using the BMM system, humans are generally required to traverse the hazardous "muck pile" in order to attempt to locate and then infer peak signals emitting from the BMM under the rock and after the blast has been fired (post-blast). The BMMs are not excavated and the locator/operator's "location" on the surface is assumed to be correct.



81.     BMT knows that its solution contains errors in a relatively high percentage of blasts, and never improved their solution despite the widely known shortfalls and their direct impact on efficiency.  The mining industry has also become very aware of these shortfalls and has been hungering for a safer and more-accurate solution for many years.

82.     If a BMM is located, its perceived location is imported into the Defendants' free tag-along BMM Explorer software, which then translates the nodes of the pre-blast ore "block" (polygon) into post-blast locations, creating a "post-blast ore polygon". The translation is performed in 2D, which the mine operator can use in attempt to reduce ore loss and minimize dilution.

83.     However, their solution is so unreliable that, in a webinar with Alyssa Kendir, BMT's Jeff Loeb remarked that they instruct users to "turn off" their BMMs inside of BMT's software when BMMs produce abnormal data that is not representative of the surrounding rock. Whether to ignore this data is done on an ad hoc basis because their software provides no guidance in isolating faulty data recorders. Ignoring collected data is bad science, but for BMT it has been big business.

84.     On top of being expensive and unreliable, they are dangerous because, in most cases, analysis requires people to walk over recently blasted ground searching for electronic signals emanating from the buried hardware. Accidents causing injuries are common for those tasked with searching for these signals.

85.     Aside from the obvious physical hazards associated with the "muck pile," humans that are required to traverse it to locate BMMs are also exposed to harmful chemicals and fumes.

86.     Blast fumes are the gases that may be generated during blasting, some of which are toxic. In terms of health impacts, the critical gases generated are oxides of nitrogen (NOx) - nitrogen dioxide (NO2) and nitric oxide (NO).

87.     NOx, which gives a blast its reddish orange color and pungent odor, is a result of unburned ANFO used in blasting.  There have been numerous studies and papers published on the harmful effects of exposure to NOx in surface blasting.

88.     Hexagon knows all of this and minimizes, or hides, the now avoidable peril that BMMs expose end users to for Hexagon's own economic benefit, *i.e.,* to increase sales by sustaining the market illusion that there are no other reliable alternatives to BMMs, such as OrePro® 3D – a product that gets more people off the muck pile.

89.     Below is another picture that is representative of this type of terrain which is inherently unstable and hazardous to humans who must walk on the "muck pile" to attempt to locate the electromagnetic signal being broadcast from a BMM.



90.     Plaintiff knows of at least one incident that nearly killed an operational mine worker attempting to locate a BMM. If that worker hadn't been wearing motocross armor (which is required by some mines), he could have been killed when he fell on the muck pile, which cracked the backplate of his armor. Some mines will not even allow personnel to walk the piles for safety reasons and are trying to use drones instead.

91.     These shortfalls are well known and have been publicly reported.

92.     For example, noted geo-statistician Ed Isaaks publicly published that BMT (and now Hexagon) may take a "sinfully misleading" approach to calculating post-blast ore loss and dilution.  This is important because ore loss and dilution are essentially BMM's value proposition because mining and sending waste to the mill for processing is an expensive and unprofitable occurrence and because BMT/Hexagon artificially compare pre-blast dig lines at their original locations with the post-blast location of their BMMs.

93.     BMT and Loeb apparently disagreed with Isaaks, even though it has known for years that its methodology and products had shortcomings, such as the ones Isaaks identified publicly, and had its principal consultant Jeff Loeb publicly refute Isaak's findings on LinkedIn.

94.     Not only did Isaaks publish a whitepaper on the topic publicly, he also publicly presented the material at SME's[2] conference in February 2020 held in Denver at the Colorado Convention Center.

95.     Isaaks also published a concept and methodology publicly, at least as early as 2014 titled "Modeling Blast Movement for Grade Control" further debunking BMT's bad faith contentions published around the world, and more recently in the BMT Litigation, that Hunt and OBC somehow misappropriated BMT's IP.

96.     Numerous participants also publicly participated in an Isaaks's thread on Linked In commenting on the topic and BMT's widely known shortcomings and archaic solution in the post-blast grade control market.

97.     This is why OBC's solution represents an existential threat to BMT's solution. It addresses all of these shortfalls and provides a much better product. Instead of relying on unreliable hardware and poorly designed software that has multiple points of failure, OrePro® 3D

---

[2] Society for Mining, Metallurgy & Exploration

revolutionized the process through 3D modeling of the blast result combined with optimization features. Below is what the Plaintiff's solution presents versus what BMT's software can do.





98.     OBC's products and solutions look nothing like BMM Explorer outputs. They achieve their results using a novel and materially different (hardware agnostic) methodology. While each product is a grade control and ore block optimization solution, their method of operation is totally different.

99.     Publicly available research has also shown that BMT's BMMs appear to be fairly inaccurate, providing bad data through human or technological error without warning, up to 40-50% of the time.  BMT and Hexagon know this because broad market experience shows error rates in excess of 100%, false detections, and 0% detection rates in some cases.

***BMT's Initial Response – Defame First, Threaten Suit Second***

100.     The lies and threats started almost immediately after OBC launched in modelling software into the market in 2019 once a market solution had been created that threatened BMT – and now Hexagon's – monopoly in post blast grade control solutions.

101.     In 2019, BMT intentionally published unsubstantiated and materially false allegations that OBC, including its principals and OrePro® 3D's inventors David LaRosa and Will Hunt,

a.     misappropriated BMT's trade secrets;

b.     infringed on BMT's copyrights;

c.     infringed on BMT's intellectual property rights, and

d.     committed unauthorized disclosure of BMT intellectual property.

102.     BMT made these false statements in order to scare OBC's customers away from its product to obstruct and restrain OBC's ability to successfully market its solution.

103.     BMT's conduct was intended to preserve BMT's monopoly in post-blast grade control solutions by stopping OBC's entrance into the market insofar as OBC was a cash starved start-up which BMT's CEO Jacque Janse and his right hand man Jeff Loeb knew full well.

104.     In February 2019, BMT had its Australia-based lawyers write the alleged employer of OBC principal and OrePro® 3D co-inventor David M. LaRosa falsely and baldly alleging that Mr. LaRosa and the company he supposedly worked for where somehow developing products that infringe on BMT's IP rights and threatening litigation.

105. In the same month, BMT also sent Will Hunt multiple letters from the same Australia-based lawyers falsely and without basis accusing him of misuse of confidential information and copyright infringement, *inter alia*, and of promoting OrePro® 3D with BMT's IP.

106. OBC has made numerous requests over the past years for BMT and Hexagon to substantiate their contentions or cease and desist in their unfairly competitive practices, which not only does harm to OBC, but also their existing and potential customers around the world.

107. In a pre-litigation effort to resolve this issue, OBC even offered to allow the parties to perform a code comparison between OBC's OrePro® 3D software and BMT's BMM Explorer software to prove that none of BMT's alleged intellectual property was used in the development of OBC's novel OrePro® 3D solution.

108. After initially agreeing to the concept, BMT went silent after it was acquired by Hexagon. Defendants' silence, today, speaks tonnes.

109. Defendants knew all along that OrePro® 3D software is fundamentally different then the aging BMM hardware, and knew that a neutral code comparison would expose their lies and abuse of the U.S. legal system, the Defend Trade Secrets Act, and Colorado state law.

110. It is also compelling that since Hunt resigned from BMT USA's employ in May, 2017 that Defendants have not introduced a software-based modeling product to the market.

111. BMT's silence was the product of ongoing discussions between it and Hexagon for an acquisition. Hexagon bought BMT in January 2020 and then turbocharged the campaign against its competitor OBC once SmartVectors™ was introduced to the market in February 2020.

### *Hexagon Buys BMT and Doubles Down on the Lies*

112. After Hexagon's acquisition of BMT, the misleading representations to existing and prospective customers about the quality of their own products in comparison to OBC's

OrePro® 3D solution and derogatory accusations about OBC and its principals only increased in vitriol and frequency.

113.    Today, these false allegations continue as an essential part of BMT's and Hexagon's sales pitch to existing and potential customers at mines around the world, including Colorado and the United States.

114.    After acquiring BMT, Hexagon created and directed BMT to publish for its own economic benefit to industry members and customers an 18-page marketing whitepaper that supposedly contained an evaluation of value lost by using "'smart vectors'" (an intentional misuse of the trademark name for OBC's computer-generated 3D vectors).

115.    The data contained in this whitepaper was actually obtained from another product altogether not owned or developed by OBC. BMT originally published their comparison report with this very same data in 2018, before OrePro® 3D and SmartVectors™ even existed.

116.    BMT and Hexagon then used the 2018 data (totally un-related to OBC or its products), then changed the labels inside their marketing materials labeling them "'smart vectors'" to intentionally discredit OBC's actual products.

117.    In addition to being deceptive and unfair, this seemingly violates every known ethical standard in engineering.

118.    This whitepaper containing these falsehoods was disseminated using interstate wire transmissions to OBC customers for the purpose convincing OBC's customers to not purchase OBC's solution.

119.    BMT and Hexagon even have a catchy, and false, marketing phrase "Modeling is a Guess, Measure for Success."

120.    Publications with that marketing phrase are materially false, deceptive, and misleading and they are disseminated using interstate wire transmissions to OBC customers for the purpose convincing OBC's customers to not purchase OBC's products.

121.    While BMT and Hexagon do not expressly reference OBC in these materials, their marketing publication deceptively cites Hunt and DeRosa more than twenty times and is clearly a deceptive attack on OBC, its principals and inventors, and its OrePro® 3D and SmartVectors™ products.

122.    The "Modeling is a Guess, Measure for Success" marketing phrase was drafted at the direction of Hexagon, under the supervision of Jeff Loeb, whom was acting at the direction and control of Jacques Janse.

123.    At the time of the "Modeling is a Guess" worldwide publication, Loeb and Janse were employed by Hexagon and acted on its behalf as agents.

124.    This deceptive and fraudulent marketing was produced in direct market response to OBC's 2020 SME-Denver presentation introducing the market to its SmartVectors™ concept and product made at the conference. Numerous Hexagon employees were in attendance at the presentation.

125.    The "Modeling is a Guess, Measure for Success" marketing campaign falsely asserts to the marketplace and customers that blast movement "cannot" be "modeled" and comes to this conclusion maliciously by selectively relying on old data and even research and publications by Will Hunt and another principal of OBC.

126.    This was done in an attempt to mislead and confuse customers by completely misrepresenting the cited work, included the work by Will Hunt, in an attempt to use Hunt's dated work against OBC years later.

127.    For example: Hexagon falsely or deceptively compares its products to OBC's SmartVectors™ in Figure 4 on pp. 8 of the whitepaper which labels "Modeled 'smart vectors versus measured BMM vectors."

128.    Significantly, the modeled vectors in Figure 4 are not an output or product generated by OrePro® 3D or SmartVectors™. This is clearly designed, drafted, and marketed by BMT and Hexagon to deceive and create an unfair competitive comparison of its hardware product to the OBC software-based product.

129.    Hexagon's marketing publication is also deceptively undated, and does not even list an author, though we know now that Hexagon employees, including Jeff Loeb, created its content and distributed it.

130.    Hexagon also intentionally misused OBC's trademarks owned and used in commerce by OBC – such as SmartVectors™ – on numerous occasions while comparing OBC's solution to its own, i.e., "measured BMM vectors."

131.    In this, its perhaps most egregious act of deceptive marketing, BMT and Hexagon go on to falsely assert that the use of "'smart vectors'" – impliedly OBC's SmartVectors™ – in a particular mine would have caused this particular mine to lose "$340,112 USD."

132.    Importantly, this data, and consequentially the financial result, is intentionally falsified and plagiarized from an entirely unrelated (to OBC) study in 2018 which Loeb/BMT claim in 2020 to be a "'smart vector'" for the sole purpose of discrediting OBC's SmartVectors™, a perceived competitor. It is totally bunk, and Hexagon knew this.

133.    Hexagon also misuses OBC's right to use trademarks by contending that OBC's solution is somehow a "magical algorithm," as if it were a fantasy subject to imagination as opposed to real-world application. This is intended by BMT and Hexagon to degrade, diminish,

mislead and confuse customers, including those engaged in interstate commerce within the United States.

134. Hexagon's use of OBC's right to use these trademarks is false advertising, bad faith, and otherwise intended to tarnish OBC, its principals, including its goods or services around the world and in interstate commerce.

135. OBC had pending before the USPTO at Serial No. 88820032 since March 4, 2020 – a date which pre-dates BMT's and Hexagon's "Modeling is a Guess, Measure for Success" marketing publication. A design mark for SmartVectors™ is depicted below, which OBC uses in interstate commerce by displaying the marks in connection with commercial transactions involving its software, goods or services:



136. Hexagon knows that OBC lawfully used SmartVectors™ as a trademark in interstate commerce and around the world because it is publicly available on the USPTO's website with a simple search, its use is marked on OBC's website and in marketing and industrywide trade publications.

137. The above was registered by USPTO on February 23, 2021 at Reg. Number 6275468.

138. Hexagon, then, on November 8, 2021 through its closely related foreign entities which is controlling – (1) Leica Geosystems Pty Ltd TA and (2) Hexagon Mining LIMITED LIABILITY COMPANY listing AUSTRALIA Level 16, 240 Queen Street Brisbane City AUSTRALIA 4000 as their address – filed with the USPTO, an application to register "SMART

VECTOR" at Serial Number 97113396 for use in the "[s]cientific, surveying, measuring, monitoring, signalling (sic), apparatus and instruments; surveying equipment and software used in the mining industry…"

139.    In this application, Hexagon – through its closely held web of entities – claims priority to an Australian trademark application for the same term that was filed in May of 2021 (more than a year after the filing of OBC's US application for the term "SmartVectors"), and which was granted in August. It was filed by the same Australian law firm (DarkIP) that sent some of the demand letters around the world without any factual or legal basis alleging that OBC and its principals misappropriated intellectual property, committed copyright and patent infringement in 2019.

140.    Curiously, Hexagon's description also includes the following within its description: "computer programs including computer programs for **modelling** and calculating rock movement in mining operations".   However, Hexagon, through its shell company BMT, previously claimed that modelling blast movement was impossible and a "guess".

141.    Furthermore, Hexagon does not have a computer program that models and calculates rock movement in mining operation at all.

142.    Hexagon's bad faith misuse of the patent and trademark processes, inside and outside the United States, and misuse of OBC's trademarks is intentional, in bad faith, and intended to confuse customers and devalue OBC's marks and products in worldwide and interstate commerce.

143.    Hexagon's published marketing whitepaper on the topic is misleading, specifically published with the intent to deceive OBC's actual and prospective customers around the world and in the U.S. who are engaged in interstate commerce.

144.    Hexagon's statements will also confuse and/or deceive a substantial portion of their intended audience into believing BMT's 2D hardware-based grade control products accomplishes the same value proposition as OBC's modeling application in 3D format.

145.    Hexagon has also marketed publicly on LinkedIn and at SME-Denver in 2020 that BMT will soon have a 3D solution that will allegedly do some of the same things that OrePro® 3D and SmartVectors™ do, such as *create a vectored block model, automatically create optimized dig shapes based on mine constraints and dig direction, and issue new polygons to the shovel for mining.*

146.    At this presentation 2020, Hexagon employee and Colorado resident Harrison Ingham, at the calculated direction of Loeb and Janse, presented a misleading slideshow concerning their alleged 3D modeling software, which was essentially the method Hunt used in a BMT case study, and notably not at all similar to that of OrePro3D. However, the industry wide presentation given in Denver, Colorado was an attempt to confuse customers of OBC's emerging technology insofar as BMT's and Hexagon's marketing materials are not a method of solving the actual problem in 3D.

147.    It is an additional indication of bad faith and ulterior motive that in the 5-years since Will Hunt resigned from BMT-USA's employ, allegedly with BMT's secrets, that neither BMT nor Hexagon, nor Loeb, nor Hare, nor Janse have been able to produce or bring into the marketplace a truly 3D product that can even approach the products and output OBC developed at considerable risk, time and expense on its own by inventing an innovative and novel model-based solution to a significant problem that BMT has known about, yet failed or refused to address since its inception.

148.    Defendants would rather abuse the legal system by asserting frivolous claims around the world to protect its market for grade control products what it once enjoyed as a monopolist.

149.    Further, the alleged false or misleading marketing materials BMT and Hexagon allege that OBC uses in connection with BMT's hardware and software are actually broadly and widely known to industry and to BMT and Hexagon alike. In-fact, BMT and Hexagon privately concede to their customers the shortcomings in Hexagon/BMT's hardware-based solution when pressed by customers.

150.    On October 22, 2020, Jacque Janse is quoted in www.australianmining.com.au, which is published around the world and in interstate commerce, falsely claiming that BMT's (really Hexagon's) solution is "knowing" whereas "modeling is guessing."

151.    Janse goes on to be quoted: "In an environment as chaotic as a blasting operation, do you really want to guess where your orebody has moved?"

152.    Janse's misrepresentations are a direct attack on model based OrePro® 3D, which is a competitive alternative to Hexagon's single use BMM product.

153.    Similarly, in a publicly available presentation by BMT-USA and Hexagon employee Harrison Ingham, a Senior Mining Services Engineer, dated September 16, 2020, which is marketed with both Hexagon's and BMT's logos, Mr. Harrison – in a slide labeled "Mythbusting" (sic) – falsely claims, without any qualification at all, that "Blast movement cannot be accurately predicted or modeled."  Remarkably, BMT – through Hexagon and Defendants Loeb and Hare – assert in the BMT Litigation that BMT owns the trade secrets associated with modeling blast movement, the very same technology that they claim is a "myth."

154.    The "Modeling is a Guess, Measure for Success" campaign is not mere puffery; it is false.

155.    Hexagon's trademark applications are not in good faith either because it too is false and intended to deceive.

156.    Defendants' conduct, which is ongoing, is clearly intended to target OBC's products and solutions in a deceptive manner in furtherance of the scheme or artifice to defraud OBC's customers so that did not, and do not, purchase OBC's solutions.

157.    Every time their whitepaper is accessed online, every time their presentations are viewed online, every time they say "Modeling is a Guess, Measure for Success" Hexagon is using interstate wire communications to further this scheme or artifice to defraud.  This scheme to defraud continues unabated to this day.

158.    The threat posed by OBC was so significant that Hexagon seem to have placed spies in recent trade show presentations given by OBC. Hexagon and Defendants conspired to commit corporate espionage and nefariously record OBC's presentation with a smart phone, even when expressly prohibited by convention rules.  One of Hexagon's industrial spies, Harrison Ingham, was observed recording the presentation in violation of trade show rules. At another more recent conference presentation, several Hexagon employees were observed while covertly filming OBC's presentation.

159.    In fact, other Hexagon employees, including Jeff Loeb, Marcel Silveira, and Jacque Janse have been caught engaging in international corporate espionage by submitting fictious names and email addresses in order to register and remotely attend OBC presentations under false pretenses in order to avoid detection.   Hexagon received the benefit of these nefarious acts by learning confidential information about a competitor OrePro® 3D.

160.    This also constitutes the use of interstate wire communications to further Defendants' scheme or artifice to defraud.

161.    Further deceptive acts were admitted in the BMT Litigation in its amended complaint concerning a particular OBC webinar. While OBC denies the allegations as BMT asserts them, this is additional indicia of BMT's deception, lies and bad faith because Jeff Loeb and Marcel Seilveira, acting as principal consultant and at BMT's and Janse's direction and control, appears to have attended the webinar deceptively and without gaining fair consent by the webinar's industry host – Seequent.

162.    Loeb has admitted to at least one customer that he attended the webinar, even though he does not appear to have been registered with the host to do so.

163.    Loeb also falsely and deceptively marketed on behalf of BMT and Hexagon to current and prospective customers that OBC's system is extremely unreliable with reference to OBC's SmartVectors™ dismissing them as mere "guesses."

164.    Loeb further falsely asserts that blast movement modeling is not possible, but sensing the customer's dissatisfaction with BMT's and Hexagon's products, then invited the customer to use even more BMMs in connection with OBC's OrePro® 3D "visualization" in order to achieve further improvements in the mine's reconciliation.

165.    Loeb's misconduct is representative of the continued campaign of commercial disparagement, unfair trade practice, and wire fraud that Hexagon used to damage OBC's business.

### Hexagon's Launch of the BMT Litigation

166.    But commercial disparagement, unfair trade practices, and wire fraud were not enough, Hexagon brought BMT to sue OBC outside of the statute of limitations.  This is consistent with the first step of Jacques Janse's strategy to deal with any competition, *i.e.,* sue them into

oblivion until they fail under the economic stress induced by bad faith litigation and commercial disparagement or sell out under the weight of vexatious litigation.

167.    Hexagon purchased BMT in January 2020 and eventually folded its assets into its web of international companies, including the employees, officers, intellectual property, tangible and intangible property leaving BMT as a shell company to camouflage and attempt to insulate Hexagon from scrutiny for its misconduct.

168.    BMT, at the direction of Hexagon financing the litigation, then filed a bad faith lawsuit eight months later on August 14, 2020 against Mr. Hunt, alleging that Mr. Hunt, an employee of BMT 3+ years prior (and outside all applicable statutes of limitation), misappropriated BMT's trade secrets and confidential information to develop OBC's OrePro® 3D modeling software for post-blast ore control.

169.    BMT at Hexagon's, Janse's, Loeb's, and Hare's direction and control made numerous misrepresentations that are materially false about Plaintiff and Mr. Hunt.  For example, Defendants asserted that Mr. Hunt's use of personal devices to perform his work, including email, a cell phone and number Mr. Hunt had since he was 18-years old, and personal DropBox, was unauthorized when this is objectively and subjectively false.

170.    In-fact, former employees of BMT were taught to use public and free tools such as their personal LinkedIn accounts to nefariously market BMT and its BMM product and were required to use personal devices, including DropBox, to share large data files with third-parties and amongst themselves in order to do their jobs because BMT refused to purchase sufficient corporate licenses and instead relied upon employees to obtain their own tools to collaborate and share information.  BMT, Janse and Loeb also knew full well that employees, including Mr. Hunt used LinkedIn and personal email to perform their work including when BMT's unreliable server

would go down or a particular mine would block access to it.  BMT did this in order to save costs and thereby increase the multiple BMT, Janse and Loeb would make on any sale of BMT.

171.    Hexagon made numerous other patently false allegations against Hunt and OBC around the world, including alleged patent infringement, copyright infringement, claims which were never prosecuted, and by asserting trade secret protection in such well-established and public mathematical concepts as inverse distance weighting and other imperceptibly broad concepts such as BMM Explorer, a piece of software that is given to third-parties for free to try out, and other information actually owned by customers such as blast data, well known blasting concepts such as timing contours, back of blast and modeling, 3D research, and the use of centerlines.

172.    Setting aside their untruthfulness, virtually every allegation in the BMT Litigation is time barred proving that the delay in filing the BMT Litigation was not motivated by objective or subjective good faith, but rather an attempt to bring a start-up company to its knees because it became a years later competitor threatening to disrupt a monopoly.  Defendants' goal is to stifle innovation for their own economic benefit, and they will say and do anything to achieve that end.

173.    The true nature of Hexagon's involvement, control and corporate shell game Hexagon was playing began to be revealed in late 2021. Hexagon was running the entire show from the beginning! Defendant Hare never worked for BMT, yet the BMT employees considered him their boss and it was Defendant Hare, in cooperation with Defendants Janse and Loeb, who orchestrated the baseless legal campaign against OBC in the District of Colorado.

### *Market Dominance: The End Game Emerges*

174.    Hexagon's real purpose in directing these false allegations and launching the BMT litigation was revealed when it attempted to acquire OrePro® 3D.

175.    When this failed, Hexagon and Hare then proposed the unlawful horizontal allocation of customers in the market for post blast grade control products.

176.    When OBC refused to bend the knee or agree to an unlawful market allocation agreement between competitors, Hexagon then sought to misuse the legal process by then trying to use the BMT Litigation to allocate the market for employees within the grade control market in order to protect its foreign based employees from being recruited by competitors.

177.    When OBC and Hunt refused to engage in the unlawful market allocation for employees, Hexagon then baselessly claimed "witness tampering" in order to attempt to use the BMT Litigation to allocate the labor market.

178.    In spite of this, Hexagon also intentionally recruited an employee of the buyer of OrePro® 3D who had late in 2021 been assigned to the OrePro® 3D team, Graeme Peters.

179.    Mr. Peters is now the Director for MineMeasure, a product offering containing BMMs and what used to be the company known as BMT, housed within the mining division at Defendant-Hexagon.

180.    Prior to being hired by Hexagon, Loeb and Hare, Mr. Peters attended an internal multiweek and confidential "master class" on the functioning of OrePro® 3D which was given by the principals of OBC and inventors of OrePro® 3D.

181.    Loeb and Hare knew this, and then willfully and maliciously hired the Canadian Mr. Peters because of his access to confidential business information, trade secrets, customer lists, pricing, strategy, etc.

182.    Defendants crafted willful and malicious strategies to lure Mr. Peters, and others, away from the OrePro® 3D team.  This was done because the confidential business information and trade secrets which Defendants obtained in the BMT Litigation through discovery was

meaningless without the help of trained employees, such as Mr. Peters, who understand how a particular technology, such as OrePro® 3D, is used, marketed, and sold and from a person who also obtained this information outside of discovery and outside of the protective order entered in the BMT Litigation.

183.   Defendants Hare, Loeb and Hexagon also conspired and then willfully and maliciously induced Mr. Peters to misappropriate trade secrets and confidential business information in violation of the Defend Trade Secrets Act and state law by nearly doubling his salary at Hexagon.   Defendants then put Mr. Peters right to work on major accounts which currently utilize OrePro® 3D using OrePro's own confidential information against it to mislead OrePro® 3D's customers, unfairly compete in the market, and negatively impacting OBC.

184.   OBC and its principals have an economic interest in the market performance of OrePro® 3D via the rights to an earnout under the asset purchase agreement with the buyer of OrePro® 3D.

185.   Further, Defendants' bad acts described herein also caused OBC to be required to allocate in excess of $2,000,000 of the purchase price of OBC's assets to anticipated defense costs before anyone would acquire any of OBC's assets which have now been spent on baseless litigation.

186.   Consequently, Hexagon's acts, at the direction and control of Hare and Loeb, are harming OBC, misusing trade secrets and confidential business information, and confusing customers thereby interfering with actual and prospective business advantage.

187.   Hexagon acquired BMT with the purpose of using it as a vehicle to attack OBC to slow its market penetration and either (1) acquire it on the cheap to maintain BMT's monopoly or (2) enter into a horizontal market allocation agreement to preserve market share.

188.    Hexagon then opposed, through shell company BMT, being joined in the BMT Litigation which necessitated this separate action to protect Plaintiff's rights.

189.    Defendants' conduct relating to market allocation as described herein is a conspiracy in restraint of trade or commerce among the several States, and with foreign nations in violation of the law, including but not limited to 15 U.S.C. § 1.

190.    As Jacque Janse has stated, and a bad faith vexatious strategy which Hexagon, Hare, and Loeb adopted with full force for their personal and corporate economic advantage, which cannot stand in a society such as the United States if it and its people are to remain the world's great innovators:

*"If they compete, we'll sue them. If they win, we'll buy them."*

### FIRST CLAIM FOR RELIEF
### (Civil Conspiracy)

191.    OBC incorporates by reference all allegations as if fully set forth herein.

192.    Defendants – in conjunction with BMT, agreed by words and conduct to accomplish the objective of acquiring OBC or entering a horizontal marketing agreement with it.

193.    Defendants committed the following unlawful overt acts, which are particularly described in this Complaint, to accomplish that goal: tortious interference with contract and prospective economic relations, false advertising and unfair competition, restraining trade, unlawful acquisition and maintenance of monopoly power, and wire fraud.

194.    The Plaintiff has damages that resulted from the acts performed to accomplish that goal that were sustained in the State of Colorado.  Theses damages include, but are not limited to, a decrease in the sales price of the assets it had to sell, decreased competition for the purchase of OBC's assets, lost sales and revenues associated with slowed market penetration of OrePro® 3D,

and the allocation of more than $2,500,000 spent defending itself against Defendants' pattern of unlawful misconduct.

## SECOND CLAIM FOR RELIEF
### (False Advertising and Unfair Competition – 15 U.S.C. § 1125)

195.    OBC incorporates by reference all allegations as if fully set forth herein.

196.    Under the direction and control of Hare, Loeb, and Janse, Hexagon has made and continues to make false and/or misleading statements of fact in connection with commercial advertising relating to OBC's alleged theft and misappropriation of BMT's trade secrets.

197.    Under the direction and control of Hare, Loeb, and Janse, Hexagon has made and continues to make representations regarding their BMM system data and the reliability of the BMT software in relation to OBC's software in false, misleading, and deceptive comparison to the same.

198.    Under the direction and control of Hare, Loeb, and Janse, Hexagon has used, in a deceptive and confusing manner, variations of OBC's trademarks in connection with its own goods or services in connection with its commercial advertising on BMT's website, in presentations, and in marketing in a manner that is likely to cause confusion or to deceive.

199.    Under the direction and control of Hare, Loeb, and Janse, Hexagon has made and continues to make false and/or misleading statements with knowledge of their falsity and/or misleading character, and/or willfully and with reckless disregard for their falsity or misleading character in violation of 15 U.S.C. § 1125.

200.    Besides the damage they have caused OBC, these statements also will cause confusion or are likely to deceive a substantial portion of their intended audience into believing BMT and Hexagon have a factual basis to assert that BMT somehow invented the OBC technology, that OBC or its principals stole it from BMT, or that OBC's products are "impossible," a "guess," or a "magical algorithm."

201.    Hexagon misrepresented, and continue to misrepresent, the nature, characteristics, qualities of OBC's products, good and services in its commercial advertising.

202.    Hexagon's statements are material as it relates to customers' purchasing decisions.

203.    Hexagon has caused and directed the false, deceptive and/or misleading statements to enter interstate commerce within the United States and cause damages therein.

204.    OBC has suffered and will continue to suffer irreparable harm, damages and economic injury as a direct and proximate result of Hexagon's false and misleading statements in the marketplace within the United States, and around the world, which directly effects a business within the State of Colorado.

205.    OBC has no adequate remedy at law for the harm caused by BMT's and Hexagon's acts and such harm will continue unless restrained and enjoined by this Court.

206.    Hexagon's actions are intentional, willful and malicious, which entitles OBC to their attorney fees and costs pursuant to statute and law.

### THIRD CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act of 1890 – 15 U.S.C. § 1)

207.    OBC incorporates by reference all allegations as if fully set forth herein.

208.    Hexagon, Loeb, Hare, Janse, and BMT conspired to create a horizontal market allocation of customers that is a *per se* restraint of trade through the mechanism of acquiring BMT with purpose of engaging in meritless litigation to pressure OBC into participating in such an agreement.

209.    Hexagon and BMT were separate economic actors pursuing separate economic interests when Hexagon and BMT conspired to create a horizontal market allocation agreement.

210.    This conspiracy had the effect of artificially deflating the value of OBC's technology and, moreover, to inflate the value of Hexagon's, creating an antitrust injury redressable by this Court.

### FOURTH CLAIM FOR RELIEF
### (Violation of the Sherman Antitrust Act of 1890 – 15 U.S.C. § 2)

211.    OBC incorporates by reference all allegations as if fully set forth herein.

212.    Hexagon attempted to possess monopoly power in the market for grade control and ore block optimization solutions.

213.    OBC created a grade control and ore block optimization solution that competed with Hexagon's solution.

214.    With the specific intent to acquire monopoly power in the market for grade control and ore block optimization solutions, Hexagon undertook a campaign of unlawful acts and meritless litigation so they could acquire their only competitor in the grade control and ore block optimization solution market. There was a dangerous probability that this attempt would have succeeded.

215.    This attempted monopolization had the effect of artificially deflating the value of OBC's technology and, moreover, to inflate the value of Hexagon's, creating an antitrust injury redressable by this Court.

### FIFTH CLAIM FOR RELIEF
### (Violation of Colorado Organized Crime Control Act, C.R.S. § 18-17-101, *et seq.*)

216.    OBC incorporates by reference all allegations as if fully set forth herein.

217.    "It is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." C.R.S. 18-17-104(3).

218.    The Defendants and non-party BMT are an enterprise associated in fact for the purpose of competing with Plaintiff in the market for grade control products.

219.    Defendants and non-party BMT knowingly engaged in acts of racketeering that are related to the conduct of this enterprise that was directed at a Colorado company (OBC) and a Colorado resident (Hunt).

220.    On multiple occasions as specified in this Complaint, the Defendants and non-party BMT, together with the others named herein, used interstate communication wires to knowingly and intentionally disseminate false information about the Plaintiff and its products and also engage in corporate espionage and other unfair or deceptive practices.

221.    The dissemination of this false information about the Plaintiff and its products was done with the purpose of executing a scheme or artifice to defraud the Plaintiff's customers so that they would not use the Plaintiff's products in violation of 18 U.S.C. 1343.

222.    Defendants knowingly participated in this pattern of racketeering activity while employed by or associated with the enterprise.

223.    Because of the Defendants' violation of C.R.S. 18-17-104(3) injured the Plaintiff, it is entitled an award of threefold of its actual damages, attorneys' fees, costs of investigation and litigation, and injunctive relief enjoining the Defendants from continuing to use interstate wire communications to knowingly and intentionally disseminate false information about the Plaintiff and its products with the purpose of executing a scheme or artifice to defraud the Plaintiff's customers so that they would not use the Plaintiff's products.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference with Contract and Prospective Economic Advantage)

224.    OBC incorporates by reference all allegations as if fully set forth herein.

225.    Janse, Loeb, Hare and Hexagon had an independent duty not to tortiously interfere with OBC's prospective economic advantage and business relations, including but not limited to its contracts and prospective opportunity with Seequent Ltd., Seequent USA Inc., and others who entered into due diligence to acquire OBC but then declined to purchase the company or its assets because of the defamatory and false dark cloud of alleged trade secret misappropriation and that its OrePro® 3D product was nothing more than a "guess," all of which  Defendants tortiously hung over OBC's head to disrupt its business advantage, actual and prospective.

226.    Janse, Loeb, Hare and Hexagon knew that OBC had contracts and potential economic advantage with current and potential customers, business relationships, etc., that arose because the value of OBC's grade control and ore block optimization solutions.

227.    Janse, Loeb, Hare and Hexagon's conduct has intentionally and by design interfered with OBC's potential business partners and companies which may be interested in acquiring licenses to use or buy OBC's grade control and ore block optimization solution.

228.    Janse, Loeb, Hare and Hexagon knew that OBC had contracts with Seequent and that Seequent intended to explore the acquisition of OBC's software and had other contractual relationships with OBC because it was announced industry-wide in early 2020 by Seequent and other media sources such as im-mining.com.

229.    Janse, Loeb, Hare and Hexagon intentionally caused false and misleading correspondence to be placed into interstate commerce and commerce around the world alleging that OBC, Hunt, and another principal of OBC stole BMT's IP or were infringing on BMT's patent.

230.    Janse, Loeb, Hare and Hexagon, intentionally caused false and misleading correspondence to be placed into interstate commerce and commerce around the world alleging that OBC solutions did not work and is merely guessing.

231.    Janse and Hexagon also communicated these same false allegations to the CEO of Seequent Shaun Maloney before filing the BMT Litigation, inside and outside of the United States. Janse and Hexagon intended to distribute false and unsubstantiated allegations to interfere with OBC's existing contracts and with their opportunities for growth in the U.S. in interstate commerce and around the world.

232.    The distribution of false, unsubstantiated, and misleading allegations by Janse, Loeb, Hare and Hexagon were directed at the worldwide market, the market for interstate commerce within the United States, and did in-fact cause harm to OBC within the U.S.A., and the state of Colorado.

233.    Janse, Loeb, Hare and Hexagon also had BMT's and/or Hexagon's legal counsel directly contact a principal of OBC through OBC's email account threatening OBC's principal and offering said principal legal advice even though BMT and Hexagon – and its overseas legal counsel – knew that OBC was represented by legal counsel within the United States and Colorado.

234.    Janse, Hare and Hexagon also communicated false and misleading marketing content to BMT's and/or Hexagon's sales agents, including Alyssa Kendir, an employee of BMT-USA based in Denver, CO, and now Hexagon, training her and others such as Jeff Loeb and Harrison Ingham to falsely and intentionally make misrepresentations to at least one prospective customer within the U.S., but outside of Colorado that OBC and Hunt stole BMT's IP.

235.    Janse, Hare and Hexagon interfered with the actual and prospective economic advantage of OBC with respect to its relationship with Seequent, and other potential acquirers and licensees of OBC's software, contractors, customers, and employees or members of the community.

236.    Accordingly, Janse, Loeb, Hare and Hexagon intentionally and tortiously breached their duty to not interfere with Plaintiff's prospective economic advantage and business relations through wrongful means.

## SEVENTH CLAIM FOR RELIEF
### (Commercial Disparagement)

237.    OBC incorporates by reference all allegations as if fully set forth herein.

238.    Janse, Loeb, Hare and Hexagon intentionally communicated and published, as outlined above, numerous false statements about OBC's products and technology.

239.    Janse, Loeb, Hare and Hexagon knew they were false.

240.    Further, the statements made by Defendants were not parody, fantasy, rhetorical hyperbole, nor imaginative expressions that could not reasonably be interpreted as stating actual facts.

241.    The opposite is true insofar as Defendants carefully and intentionally manipulated and misrepresented engineering data and case studies while concealing the author and participants, publishing it around the world for their own competitive advantage, to deceive, to misrepresent, and to lie about OBC, its products and its owners.

242.    These false publications were made with the intent, or reasonable belief, that they would cause OBC financial loss.

243.    OBC was actually damaged through lost business opportunities,  lost customers and potential customers, lost business partners, a loss in access to capital, and the loss of multiple potential buyers of OBCs business caused by this disparagement, which adversely affected OBCs value.

## EIGTH CLAIM FOR RELIEF
### (Abuse of Process)

244.    OBC incorporates by reference all allegations as if fully set forth herein.

245.    Defendants had an ulterior purpose for the continued use of a judicial proceeding and insistent prosecution of the BMT Litigation, and in their use of the U.S. and Australian patent and trademark systems.

246.    Defendants have also abused the process in the BMT Litigation by misappropriating trade secrets and confidential business information on customers and the functioning of OrePro® 3D through the willful and malicious hiring of Graeme Peters after he attended a confidential multi-week seminar in Colorado given by OBC's principals and co-inventors and when they induced Mr. Peters to misappropriate such information by doubling his salary. Defendants' conduct also had the effect of intentionally violating the Court's protective order entered in the BMT Litigation which gave Defendants' access to OBC's confidential business information and trade secrets.

247.    Defendants' willful action in the use of these proceedings to decrease the sales price of OBC's assets and business, to harm OBC's reputation and good will in the market, to slow market adoption of OBC's product OrePro® 3D and SmartVectors™, to divide up customers and employees in the market, to harm OBC's access to capital, and to sell, or purchase, OBC's assets at below market value, are not proper in the regular course of the proceedings and are otherwise the use of legal proceedings in an improper manner to accomplish an improper purpose.

248.    Defendants' have cause OBC to sustain damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

249.    OBC incorporates by reference all allegations as if fully set forth herein.

250.    OBC has a legally protected interest in the trade secrets which Defendants Hexagon, Hare and Loeb induced Graeme Peters to misappropriate.

251.    Peters was induced to misappropriate confidential customer information, lists of actual and prospective customers, pricing, and other confidential information relating to the functioning of OrePro® 3D.

252.    Defendants have obtained access to confidential information and trade secrets through the BMT Litigation and through the independent misappropriation of such by Graeme Peters thus gaining access to the information and using it in disregard for the protective order entered in the BMT Litigation.

253.    The trade secrets which were misappropriated have value to OBC which are maintained and provided in interstate commerce.

254.    Mr. Peters obtained the trade secrets which were misappropriated while he was attending a multi-week seminar put on by the principals of OBC while Mr. Peters was in Colorado.

255.    The trade secrets unlawfully obtained by Defendants are "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

256.    Defendants have willfully and maliciously misappropriated trade secrets to diverts OBC's business opportunities, including the opportunity in the earnout, for Defendants' own economic benefit.

257.    Defendants knew, or had reason to know, that the information which Mr. Peters misappropriated was disclosed to third-party customers, Hexagon, and other Hexagon employees.

258.    As a result of Defendants' misappropriation of the trade secrets, Defendants have and continue to violate the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1).

259.    Unless injunctive relief is granted, Defendants will continue to misappropriate and benefit from the misappropriation of the trade secrets and will continue to cause further irreparable injury to OBC.

260.    Defendants have also violated Colorado state law, specifically, the Colorado Uniform Trade Secrets Act ("CUTSA"), C.R.S. § 7-74-101, *et seq.*

261.    As a result of Defendants' misappropriation of the trade secrets and confidential business information through Peters and in the BMT Litigation, Defendants have and continue to violate the CUTSA, C.R.S. § 7-74-104.

262.    Pursuant to CUTSA and DTSA, OBC is entitled to preliminary and permanent injunctive relief.

263.    OBC has suffered, and will continue suffer, actual damages in an amount to be established at trial caused by Defendants.

264.    By virtue of Defendants' bad faith, fraudulent, willful and malicious misappropriation of the trade secrets and confidential business information by Peters and in the BMT Litigation, OBC is entitled to an award for its damages, exemplary damages in an amount at least equal to the awarded damages and reasonable attorneys' fees, as provided for by the CUTSA, C.R.S. §§ 7-74-104 & 7-74-105).

265.    By virtue of Defendants' bad faith and willful and malicious misappropriation of the Plaintiffs' Trade Secret Information, the Plaintiffs are entitled to an award for their damages, exemplary damages in an amount up to two times awarded damages and reasonable attorneys' fees, as provided for by the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§1836(b)(3)(B)-(D).

## PLAINTIFF DEMANDS TRIAL BY JURY

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, OBC respectfully requests that the Court enter judgment in its favor against Defendants Hexagon Mining Inc., Jacque Janse, Jeffrey Loeb, and Nicholas Hare, both jointly and severally, and award to OBC:

A.      Enter judgment in favor of the Plaintiffs and against Defendants on all claims for relief;

B.      Award the Plaintiffs any profits earned by Hare, Loeb, Janse, and Peters and Hexagon pursuant to 15 U.S.C. § 1117.

C.      Enter a preliminary and permanent injunction enjoining Defendants from making false, deceptive and misleading statements concerning OBC and its products and from misusing its trademarks in violation of the Lanham Act;

D.      Enter a preliminary and permanent injunction enjoining Defendants from using OBC's confidential business information and trade secrets and engaging in interstate wire communications to knowingly and intentionally disseminate false information about the Plaintiff and its products with the purpose of executing a scheme or artifice to defraud the Plaintiff's customers so that they would not use the Plaintiff's products

E.      Award OBC its compensatory, special, incidental, and consequential damages in an amount to be proven at trial, including but not limited to damages for loss of revenue, loss of profits, and injury to reputation and economic opportunity;

F.      Award OBC threefold damages its actual damages, attorneys' fees, costs of investigation and litigation;

G.      For punitive damage when and if permitted by law;

H.      Pre-judgment and post-judgment interest at the maximum amount permitted by law;

I.      Reasonable attorney fees and costs pursuant to statute; and

J.      Such other and further relief as this Court deems just and proper.

Dated: July 27, 2022.

Respectfully submitted,

M<sup>c</sup>Leod | Brunger PLLC

*By:* */s/* Joseph A. O'Keefe
10375 Park Meadows Drive, St. 260
Lone Tree, CO 80124

(720) 443-6600
jokeefe@mcleodbrunger.com
***Attorneys for Plaintiff***